**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| A.B., a minor, R.B., a minor, and ROCHELLE VERMEULEN, in her individual capacity and as mother and next friend for A.B. and R.B., minors, | |
| Plaintiffs, | JURY DEMAND |
| v. | |
| CAROLYN HOLLIMAN, DCFS Investigator, in her individual capacity; CLARA YANES, DCFS Supervisor, in her individual capacity, ALEXIS CARLISLE, DCFS Area Administrator, in her individual capacity; CHILDREN'S HOME + AID ("CHAID"); TIFFANY SLOAN, CHAID Case Manager, in her individual capacity; MARIA SAETHRE, CHAID Supervisor; CATHERINE CASING, CHAID Supervisor; CHARISSA JONES, CHAID Family Services Manager; LESLIE JACOB, CHAID Program Manager; ROSA FRIAS, DCFS Investigator, in her individual capacity; ELIZABETH KIMBLE, DCFS Supervisor, in her individual capacity; and BOBBIE GREGG, DIRECTOR OF ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES ("DCFS") in her official capacity, | |
| Defendants. | |

**COMPLAINT**

## I. INTRODUCTORY STATEMENT

1. This three-count civil rights complaint, brought pursuant to 42 U.S.C. § 1983, arises from the actions of the Illinois Department of Children and Family Services ("DCFS"), its assigned-case management agency Children's Home + Aid ("CHAID") and various employees and administrators of both agencies (DCFS and CHAID) who seized and

continued to detain twin babies away from their loving and caring mother for seven weeks, without consent, court order, or exigent circumstances, because she had fled to safety from her violent batterer. Defendants, acting under color of state law, have caused severe harm to the plaintiff mother and children.

## II.  JURISDICTION AND VENUE

2.  This Court has jurisdiction over Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 and pursuant to 28 U.S.C. §§ 1331 and 1343(3). This Court has jurisdiction over certain defendants pursuant to 28 U.S.C. § 1367.

3.  Venue is proper in this district because:

(a) The Northern District of Illinois is the judicial district in which substantially all of the events or omissions giving rise to Plaintiffs' claims occurred; and

(b) Defendants are found or are employed, or at the time of the incidents giving rise to this suit were so employed, in the Northern District of Illinois.

## III. PARTIES

4.  Infant Plaintiff A.B., born in May 2013, is the daughter of Plaintiff.  At all times prior to and after the actions complained of herein, A.B. resided with Plaintiff in Romeoville, Illinois. Pursuant to Federal Rule of Civil Procedure 17(c), Plaintiff A.B. proceeds here by her mother and next friend, Rochelle Vermeulen.

5.  Infant Plaintiff R.B. is A.B.'s twin brother. At all times prior to and after the actions complained of herein, R.B. resided with Plaintiff  in Romeoville, Illinois. Pursuant to Federal Rule of Civil Procedure 17(c), Plaintiff R.B.  proceeds here by his mother and next friend, Rochelle Vermeulen.

6.  Plaintiff Rochelle Vermeulen ("Plaintiff") is the mother and next friend of infant plaintiffs AB. and R.B.

7.  Defendant CAROLYN HOLLIMAN, at all relevant times giving rise to this complaint, was a DCFS investigator who was assigned to investigative duties involving Plaintiffs Vermeulen, A.B., and R.B. commencing August 12, 2014. She is sued in her individual capacity.

8.  Defendant CLARA YANES  at the time of the incidents giving rise to this complaint, was a DCFS supervisor. Defendant Yanes was responsible for reviewing and approving the actions of Defendant Holliman, and did review and approve Defendant Holliman's actions affecting the care and custody of A.B. and R.B. as well as the decision to "indicate" Plaintiff for "environment injurious," in accordance with a legally void policy and procedure. She is sued in her individual capacity.

9.  Defendant ALEXIS CARLISLE is an Area Administrator for DCFS, who at all relevant times had supervisory responsibility as to Defendant Yanes. Upon information and belief, Defendant Carlisle reviewed and approved the seizure of infant plaintiffs from Plaintiff and the infant plaintiffs' continued detention and out-of-home placement. She is sued in her individual capacity.

10. Defendant CHILDREN'S HOME + AID, referred to herein as "CHAID", is a non-profit corporation licensed in the State of Illinois which provides child welfare and foster care services under a purchase-of-services contract with DCFS. At the time of the incidents giving rise to this complaint, Defendant CHAID acted as DCFS's agent, acting under color of state law as to its delegated responsibilities with respect to plaintiffs.

11. Defendant TIFFANY SLOAN, at the time of the incidents giving rise to this complaint, was a case manager for CHAID. Defendant Sloan was assigned to plaintiffs' case by DCFS, and was responsible for the continued detention of infant plaintiffs from Plaintiff and for enforcing the illegal restrictions on contact between Plaintiff and infant plaintiffs that had been initiated by defendants Holliman, Yanes, and Carlisle.

12. Defendant CATHERINE CASING, at the time of the incidents giving rise to this complaint, was a supervisor for CHAID with responsibility for supervising defendant Sloan and in that capacity was, on information and belief, responsible for continuing the detention of infant plaintiffs from Plaintiff and enforcing the illegal restrictions on contact between Plaintiff and infant plaintiffs that had been initiated by Defendants Holliman, Yanes, and Carlisle.

13. Defendant MARIA SAETHRE, at the time of the incidents giving rise to this complaint, was also a supervisor for CHAID with responsibility for supervising Defendant Sloan and in that capacity was responsible for continuing the detention of infant plaintiffs and enforcing the illegal restrictions on contact between Plaintiff and infant plaintiffs.

14. Defendant CHARISSA JONES, at the time of the incidents giving rise to this complaint, was a Family Services Manager for CHAID with supervisory responsibility over defendant Casing and the persons under defendant Casing's supervision. Defendant Jones was responsible for continuing the detention of infant plaintiffs away from Plaintiff and enforcing the illegal restrictions on contact between Plaintiff and infant plaintiffs.

15. Defendant LESLIE JACOB, at the time of the incidents giving rise to this complaint, was the Director of Family Centered Services for CHAID with supervisory responsibility as to Charissa Jones and ultimate responsibility for the persons under Defendant Jones's supervision. In that capacity, Defendant Jacob was responsible for the continued detention of

4

infant plaintiffs and enforcing the illegal restrictions on contact between Plaintiff and infant plaintiffs.

16. Defendant ROSA FRIAS, at the time of the incidents giving rise to this complaint, was a DCFS investigator who was assigned to investigative duties involving plaintiffs on or after September 25, 2014. She is sued in her individual capacity.

17. Defendant ELIZABETH KIMBLE, at the time of the incidents giving rise to this complaint, was a DCFS supervisor. Defendant Kimble was responsible for reviewing and approving the actions of Defendant Frias, and did review and approve Defendant Frias's actions affecting plaintiffs.  She is sued in her individual capacity.

18. Defendant BOBBIE GREGG is the Director of DCFS. She is sued in her official capacity for declaratory relief.

19. At all times relevant to this complaint, each Defendant acted under color of state law.

## IV.  STATEMENT OF THE CASE:

### A.    INCIDENTS GIVING RISE TO THIS COMPLAINT

20.  Plaintiff gave birth to twin infant plaintiffs A.B. and R.B. in May  2013.

21.  Plaintiff signed a voluntary acknowledgement of Ryan B.'s parentage of A.B. and R.B. at the hospital where they were born.

22. From approximately August of 2012 until August 11, 2014, Plaintiff had been in relationship with Ryan B.

23. At the end of May, 2014, while Plaintiff was grieving for her mother who had died suddenly on May 20, 2014, Ryan B. began physically abusing Plaintiff. His violent assaults against Plaintiff included repeatedly choking her, hitting her in the face, throwing her against the wall, and body slamming her onto the  top of a dog cage.

5

24. The injuries that Ryan B. inflicted caused Plaintiff to be hospitalized more than once, and caused her serious back pain, shooting pains, visible bruises and emotional injury. When Plaintiff sought assistance from the Romeoville Police, the police failed to arrest Ryan B., the batterer.

25. While extremely abusive to Plaintiff, the batterer did not physically abuse the infant plaintiffs.

26. On August 11, 2014, Plaintiff had a medical appointment for the infant plaintiffs but the batterer refused to give Plaintiff the keys to the car to so that Plaintiff could take the infant plaintiffs to the doctor. Plaintiff decided to separate from the batterer, leaving her shared residence with him and ending their intimate relationship.

27. As she was leaving with the infant plaintiffs, the batterer became extremely violent, spitting into Plaintiff's face and pushing her into a wall. Plaintiff called the Romeoville Police, who assisted Plaintiff in moving with the infant plaintiffs to the home of her stepfather, James Osusky, in Romeoville, Illinois.

28. The next day, the wife of Ryan B.'s half-brother called the DCFS Hotline and made allegations of abuse and neglect against Plaintiff in order to help the batterer obtain custody of the infant plaintiffs.

29. DCFS initiated an investigation against both Plaintiff and Ryan B. Defendant Holliman was assigned to conduct the investigation.

30. At approximately 5:00 p.m. on August 12, 2014, Defendant Holliman appeared at the home of Plaintiff's stepfather. Plaintiff advised Defendant Holliman that she had moved to escape Ryan B.'s violent abuse against her.

6

31. Defendant Holliman telephoned the batterer, who claimed, falsely, that there was mold in the Osusky house, and insisted that the infant plaintiffs could not remain in the Osusky house.

32. If the adequacy of housing for minors is in question in an investigation of alleged child neglect, DCFS is required, by policies established following the consent decree in *Norman v. McDonald*, 930 F. Supp. 1219 (N.D. Ill. 1996), to provide assistance with children's living arrangements rather than remove children from their parents due to concern about their living conditions.

33. If Osusky's home actually had mold, DCFS investigator Defendant Holliman was required to assist Plaintiff to correct the problem and find alternative shelter rather than separate a mother from her children. Defendant Holliman did neither of these things. In fact, the home did not have mold.

34. Heeding the demands of the batterer and without verifying the presence of mold in the Osusky home, Defendant Holliman ordered that the infant plaintiffs could not remain at the Osusky home. Defendant Holliman pressed Plaintiff to seek shelter at Groundworks Guardian Angel Home ("Groundworks"), a home for domestic violence victims. Plaintiff immediately complied, eager to find a safe residence that was acceptable to DCFS.

35. Groundworks shelter staff immediately offered shelter to Plaintiff and the infant plaintiffs.

36. When Plaintiff told Defendant Holliman that she had secured shelter, Defendant Holliman changed her position and insisted upon obtaining verification of the availability of beds for the plaintiffs at Groundworks.

37. Based on its confidentiality policies, Groundworks staff asked for a written consent from Plaintiff before giving information to Defendant Holliman.

38. Plaintiff offered to go immediately to a nearby 7-11 store to fax her written consent to Groundworks to allow the shelter to confirm the bed space, but Defendant Holliman refused, saying she was "too tired," was not willing to wait, and was "done" dealing with Plaintiff.

39. By that time, the batterer had arrived at Osusky's home with his mother and stepsister.

40. The batterer and his family pressed Defendant Holliman to remove infant plaintiffs from Plaintiff and place them with the batterer's relatives, including with his half-brother, who on information and belief has a criminal record and served a five year prison sentence, and the half-brother's wife.

41. Plaintiff strenuously objected to the removal of infant plaintiffs from her care, but defendant Holliman summarily rejected all of her objections. Plaintiff begged Defendant Holliman to let infant plaintiffs stay with maternal relatives instead of the batterer's family if the infant plaintiffs could not remain with Plaintiff. Plaintiff also vigorously objected to any placement of the children with a person with a criminal record.

42. Without possessing any definite or articulable evidence giving rise to a reasonable suspicion of abuse or neglect of the children or probable cause to believe that they had been, were being or would be abused or neglected by plaintiff, Defendant Holliman decreed that Plaintiff could not keep infant plaintiffs and also that none of Plaintiff's relatives could take infant plaintiffs.

43. Defendant Holliman insisted that infant plaintiffs had to be placed with another of the batterer's relatives, his other brother and sister-in-law, Michael and Jessica, who had met

8

infant plaintiffs only once before. Defendant Holliman moved quickly to secure a background check on the brother and sister-in-law and pronounced that they were "cleared."

44. Plaintiff begged Defendant Holliman to go with Plaintiff to Groundworks Shelter to verify that space was available. Again, Defendant Holliman refused, repeating that she was "too tired" and that she was "done" dealing with Plaintiff.

45. Defendant Holliman then told Plaintiff that Plaintiff had to sign a so-called "safety plan" form to effectuate the placement of the children with the batterer's brother Michael and sister-in-law Jessica. When Plaintiff attempted to object, Defendant Holliman told Plaintiff, "You have no choice."

46. In shock and in tears, Plaintiff finally signed the out-of home "safety plan" effectuating the quasi-foster care placement with the batterer's relatives Michael and Jessica. The batterer did not sign the safety plan at all; Defendant Holliman wrote "Dad made verbal agree [sic]" in the space for the second parent's signature**.**

47. After refusing to go with Plaintiff to the Groundworks shelter where Plaintiff could have resided safely with the infant plaintiffs, Defendant Holliman directed the batterer's mother and  stepsister to drive infant plaintiffs to the quasi-foster home with the near-strangers Michael and Jessica. Defendant Holliman followed closely behind and met the infant plaintiffs at the quasi-foster home, leaving a shocked and distressed Plaintiff behind.

48. The placement effectuated by this agreement is referred to herein as the "quasi-foster care placement" because in almost all relevant respects, the defendants proceeded to treat Michael and Jessica the same as foster care parents who are given legal responsibilities under Illinois law to serve as primary caretakers for the children placed with them by DCFS.

49. In order for a foster home placement to comply with Illinois law, there must first be a juvenile court order giving DCFS legal responsibility for placing children away from their parents.

50. Even foster parents who are lawfully caring for children in the custody of DCFS must obtain consent from the DCFS Guardianship Administrator in order to obtain non-emergency medical care for children placed with them.

51. In order to permit foster parents to limit contact between a parent and her children or to supervise parent-child contact with each other, Illinois law requires a court order restricting the parent's contact to supervised contact only.

52. While DCFS Defendant Holliman directed the placement of the infant plaintiffs into the home of Michael and Jessica, at no time did she or Defendant Yanes takes steps necessary to make the home a lawful foster home, apart from the initial background check and home safety checklist.

53. Defendant Holliman instructed both Plaintiff and the quasi-foster parents that Plaintiff could visit infant plaintiffs only under the supervision of the quasi-foster parents. Acting pursuant to Defendant Holliman's instruction, the quasi-foster parents limited Plaintiff's supervised contact with infant plaintiffs to a few hours per day, a few days per week.

54. On August 13, 2014, Plaintiff went to Groundworks shelter, which still had room for Plaintiff and infant plaintiffs. Groundworks faxed information to Defendant Holliman, confirming that they did indeed have beds for Plaintiff and infant plaintiffs. Defendant Holliman responded that she "never told her to go there." When Plaintiff asked Defendant

Holliman to bring infant plaintiffs to Groundworks shelter, Defendant Holliman responded, without any basis or reason, "We're not looking at that yet."

55. Under DCFS protocols, any out-of-home placement of children away from their parents, such as Defendant Holliman effectuated, is to be reassessed weekly and may be modified or ended at any time. Contrary to said protocols, defendant Holliman rebuffed all of Plaintiff's requests for reassessment or return of the infant plaintiffs to her care.

56. The quasi-foster home placement into which DCFS had placed the children, and CHAID later continued, was a chaotic and overstressed home. The quasi-foster parents have three children of their own. The quasi-foster parents made demands on Plaintiff that she provide food and supplies for the five members of their family when Plaintiff visited with the infant plaintiffs in their home. Defendant Holliman never set limit upon the demands the quasi-foster parents could impose upon Plaintiff. Nor did Defendant Holliman provide Plaintiff any recourse to complain of unreasonable demands or unlawful actions by the quasi-foster parents.

57. On August 19, 2014, the quasi-foster mother, without Plaintiff's knowledge or consent, amended the infant plaintiffs' health care enrollment so as to authorize care of the infant Plaintiffs by doctors of the quasi-foster mother's, not Plaintiff's, choice.

58. Thereafter, on August 22, 2014, Plaintiff met the quasi-foster mother for a medical exam with the infant plaintiffs' regular doctor for an appointment that Plaintiff had rescheduled from August 11, 2014, when the batterer had taken Plaintiff's car keys. The appointment with the regular doctor did not occur as scheduled due to a delay at the doctor's office in being able to see the children.

59. As Plaintiff learned later, the quasi-foster mother proceeded to take the infant plaintiffs to a different doctor and different medical practice group, selected by the quasi-foster

11

mother. To secure medical treatment for the infant plaintiffs, the quasi-foster mother falsely claimed to the medical treatment provider that DCFS had given her legal custody of the infant plaintiffs.

60. Upon information and belief, Defendant Holliman facilitated the quasi-foster mother's ruse by failing to advise the quasi-foster mother of the law regarding medical treatment of children in DCFS care or informing her that neither she nor DCFS itself had legal authority to obtain non-emergency medical care for the infant plaintiffs without parental consent.

61. On or about August 28, 2014, pursuant to a purchase-of-service agreement between DCFS and CHAID, Defendant CHAID assumed responsibilities as the primary case manager for Plaintiff and the infant plaintiffs under a so-called "intact family services" program. CHAID's responsibilities under the contract with DCFS included supervising the ongoing out-of-home placement that Defendant Holliman had initiated with the quasi-foster parents. CHAID was also responsible for developing a service plan under which CHAID would decide the extent of contact between infant plaintiffs and Plaintiff during their out-of-home placement and the conditions under which the infant plaintiffs could return home to Plaintiff.

62. Defendant Sloan assumed primary responsibility for reviewing the out-of-home placement and determining when to return infant plaintiffs to Plaintiff.

63. Plaintiff made repeated requests to defendant Sloan to return infant plaintiffs, starting as soon as Plaintiff first met Sloan on or about August 28, 2014. Defendant Sloan refused every request until on or about September 29, as described in paragraph 91 below.

64. On September 17, 2014, Plaintiff again requested that Defendant Sloan place infant plaintiffs with a maternal relative if the infant plaintiffs could not be returned to her care.

Defendant Sloan responded that she needed to do a background check and home inspection of that relative.

65. On September 18, 2014, Plaintiff provided contact information of Plaintiff's grandmother, Ann Osusky, who lived approximately 30 minutes away from Plaintiff, and Defendant Sloan promised to start the background check.

66. Approximately one hour after agreeing to start the process to review Ms. Osusky's home as a placement for the infant plaintiffs, Defendants Sloan and Saethre came to the quasi-foster home while Plaintiff was visiting the infant plaintiffs, demanding that Plaintiff sign a new so-called "safety plan" form to continue the quasi-foster parent status of the batterer's family members Michael and Jessica.

67. Both Defendant Sloan and Defendant Saethre insisted that infant plaintiffs would remain where they were rather than return to Plaintiff or move to Plaintiff's grandmother's home. Defendant Saethre declined to screen Plaintiff's grandmother for placement of the infant plaintiffs with her because no one was available to inspect the home, claiming that it was "too far away."

68. Plaintiff informed Defendant Saethre that a mold inspection of the Osusky home was to occur that same afternoon. Defendant Saethre stated if there was no mold in the Osusky home, CHAID would return infant plaintiffs to Plaintiff.

69. Despite that promise, Defendant Saethre demanded that Plaintiff sign an out-of-home placement form for infant plaintiffs to remain with the batterer's brother and sister-in-law. When Plaintiff asked Defendant Saethre why she had to sign the form immediately, Defendant Saethre became visibly angry.

13

70. Defendant Saethre repeatedly said that she was not going to wait any longer, and that Plaintiff had "no choice" but to sign the form.

71. Plaintiff attempted to write that she was signing the safety plan form under duress. Defendant Saethre refused to allow any statement to that effect on the form, repeatedly saying to Plaintiff: "Really? Really? Are you under duress right now?" When Plaintiff answered "yes," Defendant Saethre continued to demand that Plaintiff sign then and there.

72. Plaintiff signed the safety plan form that stated that the infant plaintiffs would remain at the home of Michael and Jessica and that all of her contact with infant plaintiffs would be supervised by Michael and Jessica. Defendants Sloan and Saethre refused to provide Plaintiff with a copy of the new safety plan form she had been forced to sign.

73. After Plaintiff had been forced to acquiesce to continuing the new quasi-foster care placement and signed the safety plan form, Defendants Sloan and Saethre visibly relaxed. Defendants Saethre and Sloan told Plaintiff that infant plaintiffs would be returned to her when the following occurred: (1) the Osusky house was checked for mold and cleared; (2) Plaintiff began her counseling sessions and classes for victims of domestic violence; (3) Plaintiff scheduled another drug and alcohol assessment; and (4) Plaintiff had arranged for daycare during the times she was at work or receiving social services. Defendants Sloan and Saethre also asked Plaintiff for written consent to speak to Plaintiff's personal physician, which Plaintiff provided immediately.

74. As of September 24, 2014, plaintiff had satisfied all of defendants' demands:

       (a) James Osusky's home was inspected on September 18, 2014 (at a cost of $300 to Plaintiff), and found to be free of mold.

(b) Plaintiff began counseling and classes for victims of domestic violence on September 22 and 23, respectively.

(c) Plaintiff scheduled a drug and alcohol assessment for October 16, 2014 at the Will County Health Department.

(d) Plaintiff made childcare arrangements at a nearby daycare center, which had agreed to accept infant plaintiffs as soon as necessary.

75. After learning that all the conditions (set forth in paragraph 73 above) had been satisfied, Defendant Sloan did background checks on James Osusky and inspected his home on September 24 (where Plaintiff had continued to reside since August 11, 2014), finding it to be safe, with ample space for Plaintiff and infant plaintiffs.

76. Instead of returning infant plaintiffs to Plaintiff, defendants Saethre and Sloan decided to move infant plaintiffs to their paternal grandparents' home while the quasi-foster parents Michael and Jessica went out of town for the ensuing weekend.

77. After learning from Defendants Saethre and Sloan that the infant plaintiffs would go to the paternal grandparents' home rather than to her grandmother's home or her own home, Plaintiff realized that, despite their promises, and all of her efforts to comply as quickly as she could with their demands, Defendants CHAID, Saethre, and Sloan had no intention of returning infant plaintiffs to her care.

78. On September 25, 2014, plaintiff made a written demand for the return of infant plaintiffs to Plaintiff's care and custody to DCFS Legal Counsel, to CHAID Vice President Melissa Ludington, and to Defendants Sloan, Casing, Jones, and Jacob.

79. On September 25, 2014, the batterer and/or his half-brother (who on information and belief has a criminal record) and/or his wife made another Hotline call to DCFS on September

25, 2014, alleging that Plaintiff had posted a Facebook page regarding her use of substances "Molly" and "Norco."

80. Though not required to accept this Hotline call, DCFS accepted the call for investigation, and, on information and belief, coded the call as giving rise to an investigation under Allegation 60. The September 25 Hotline call does not meet the threshold for neglect under that Allegation insofar as there is no likelihood of harm to the 15-month-old infant plaintiffs from a Facebook posting, even if that posting had been done by Plaintiff herself. *See* Paragraph 136-144 *infra* (setting forth the legal issues involving Allegation 60 as applied to Plaintiff).

81. DCFS accepted the new September 25, 2014 Hotline call against Plaintiff and assigned it to Defendant Rosa Frias for investigation, to be supervised by Defendant Kimble.

82. DCFS does not screen out calls that are made for ulterior purposes. In this instance, the batterer's (or his half-brother's or his wife's) Hotline call was part and parcel of the batterer's efforts to control and intimidate Plaintiff. Shortly after Plaintiff had left the batterer, the batterer himself had created the Facebook page in Plaintiff's name. He also reinstated a prior Facebook page she had deactivated, which he was able to do because he was withholding Plaintiff's notebook/tablet that had all of her passwords saved there; he had refused to turn over Plaintiff's property after she fled his violence against her.

83. Plaintiff first learned that a new Hotline call had been made when Defendant Jones notified Plaintiff's counsel herein about it on September 26, 2014, alluding to a Facebook posting Plaintiff allegedly had made. On information and belief, no DCFS investigator assigned to investigate the Hotline call attempted to contacted Plaintiff about the call until

September 30, 2014 (*see* Paragraph 99 *infra*) so Plaintiff was unable to defend herself against the call or present her reasons demonstrating its lack of merit.

84. Responding to the demand letter sent to them on September 25, Defendant Jones and Defendant Jacob on September 26 expressly refused to return infant plaintiffs to Plaintiff. Defendant Jacob stated that Defendant CHAID had decided it was "in the best interests of the children to stay where they are."

85. Later the same day, Defendant Jacob announced that defendants would allow the batterer to move into the quasi-foster home with Michael and Jessica and their three children, along with the infant plaintiffs, on September 29, and to have unsupervised contact with the infant plaintiffs thereafter.

86. Defendant Jacob justified the refusal to return the infant plaintiffs to Plaintiff on the ground that Plaintiff had been "indicated" for neglect of infant plaintiffs on September 22, 2014 for "Allegation 60," which is defined as neglect due to creating an "environment injurious" to minor children. (*See* paragraphs 136-144 *infra* regarding Allegation 60). On information and belief, the batterer was also "indicated" for neglect on September 22. Defendant Sloan that same day had told Plaintiff that she had been indicated for failing to leave the batterer earlier than August 11, 2014.

87. Defendant Holliman previously had told Plaintiff that both Plaintiff and the batterer were being "indicated" for Allegation 60, because Plaintiff had failed to leave the batterer earlier, but had not finalized the indicated finding at that time.

88. Over the weekend of September 27-28, because CHAID and the CHAID defendants Jacob, Jones, Saethre, and Sloan had refused to return the children to Plaintiff's care, Plaintiff

was compelled to visit her children at the home of the batterer's parents, under their supervision.

89. The batterer was present throughout Plaintiff's single one-and-a-half hour visit with infant plaintiffs on September 28. Plaintiff asked the batterer to leave the home during her visit with the children, but he refused, causing Plaintiff great fear for her safety.

90. On September 29, 2014, infant plaintiffs disappeared. Believing that the grandparents had returned the infant plaintiffs to the quasi-foster parents per the plan that had been described to Plaintiff by CHAID Defendant Jacob, Plaintiff repeatedly attempted to contact the quasi-foster parents, but was unsuccessful. Plaintiff also contacted Defendant Sloan, who did not tell plaintiff where the infant plaintiffs were.

91. Sometime in the afternoon or evening of September 29, 2014, Defendant Sloan notified Plaintiff, the batterer, and each of the quasi-foster parents that the placement of the infant plaintiffs had ended, that the safety plan was being terminated, and that Plaintiff was allowed to pick up infant plaintiffs from the quasi-foster home.

92. Defendant Sloan refused to provide written confirmation of this decision and refused Plaintiff's requests for assistance in retrieving infant plaintiffs.

93. On the evening of September 29, Plaintiff secured a police escort to go to the quasi-foster parents home to pick up the infant plaintiffs. The quasi-foster parents did not answer the door when Plaintiff knocked.

94. When the police demanded entry, the quasi-foster mother responded that the infant plaintiffs were not with her but were instead with Ryan (the batterer). The police told Plaintiff that, because Ryan was the infant plaintiffs' father, they would not remove the infant plaintiffs from him without a court order.

95. For three days, Plaintiff did not know where her children were, and whether they were safe. Since Ryan had unlimited access to the infant plaintiffs, Plaintiff was gravely concerned that he might kidnap them, hide them from her, or injure or mistreat them.

96. During said three-day period, Defendant CHAID and the CHAID defendants named herein did not assist Plaintiff in locating the infant plaintiffs, or assist her with law enforcement efforts she made to secure the return of the infant plaintiffs to her care.

97. Despite having assumed a special responsibility for assuring the safety and well-being of the infant plaintiffs, Defendant CHAID and the CHAID defendants named herein were deliberately indifferent to the infant plaintiffs' safety and well-being and to the familial association rights enjoyed by Plaintiff and the infant plaintiffs. Though aware of batterer's history of violence against Plaintiff, which was the reason Plaintiff herself had been indicated for Allegation 60, and that his half-brother who had unfettered access to the infant plaintiffs was reportedly a convicted criminal, CHAID and the CHAID defendants permitted the batterer and his half-brother and other members of the batterer's family to associate freely with the infant plaintiffs while depriving Plaintiff of access to them.

98. On September 30, 2014, at approximately 4:30 p.m., Plaintiff obtained an emergency Order of Protection from the Will County Circuit Court that commanded the batterer to return the children to Plaintiff immediately.

99. Plaintiff learned of DCFS investigator Defendant Frias's involvement with the infant plaintiffs because Defendant Frias came to the Osusky home to interview Plaintiff on the evening of September 30. Defendant Frias sought to interview Plaintiff regarding the new Hotline call that had been assigned to her for investigation sometime on or after September 25. At the time Defendant Frias went to the Osusky home, Plaintiff was not home because she was

already at the Romeoville Police station trying to locate her children and to enforce the Order of Protection she had just obtained.

100. The batterer and the quasi-foster parents continued to refuse to release the infant plaintiffs to Plaintiff or even to let Plaintiff know infant plaintiffs' whereabouts, despite Plaintiff's many phone calls to them and to various defendants, seeking assistance.

101. On October 1, 2014, Defendant Sloan admitted that she had no idea where the infant plaintiffs were.

102. Still without access to her children and now with an Order of Protection in hand, Plaintiff secured the assistance of the police in the morning of October 1, 2014.

103. On the morning of October 1, 2014, Plaintiff called Defendant Frias, seeking information about the whereabouts of the infant plaintiffs and assistance in securing their return, as the Order of Protection directed.

104. Defendant Frias refused to tell Plaintiff where infant plaintiffs were but represented that the infant plaintiffs were "fine." Defendant Frias also refused to help to effectuate the turnover of the infant plaintiffs to Plaintiff from the batterer.

105. Plaintiff's counsel notified Defendant Frias that Plaintiff had obtained an Order of Protection that required the infant plaintiffs to be returned to her care by the batterer. Defendant Frias insisted that Plaintiff did not have a right to have the children returned to her due to the Hotline call that she, Defendant Frias, had been assigned to investigate. After becoming aware of Defendant Frias's claim that DCFS had the authority to override the Order of Protection, Plaintiff's counsel attempted to reason with Defendant Frias and urged her to obtain legal counsel for herself with regard to the infant plaintiffs and Plaintiffs' circumstances.

106. At about 1:00 p.m., Defendant Frias, acting with the knowledge and consent of defendant Kimble, directed that Plaintiff needed to come to the DCFS office in Joliet.

107. At approximately 3:00 p.m. on October 1, Plaintiff arrived at the DCFS office and discovered that the batterer, his mother, his half-brother (who is believed to have a criminal record) and his wife were already present.

108. When she saw Ryan, the batterer, he taunted her about the new Hotline call. His words were, "Ha, ha, we put another allegation on you."

109. After seeing the batterer at the DCFS office, Plaintiff called the Joliet Police for assistance in serving the Order of Protection upon the batterer and securing the return of infant plaintiffs.

110. Shortly after calling the police, Plaintiff learned that the infant plaintiffs were also at the DCFS Office. Despite begging Defendants Frias and Kimble to let her have contact with them, Defendants and Frias and Kimble refused to allow her to see the infant plaintiffs.

111. A two-and-a-half hour stand-off followed. Defendants Frias and Kimble repeatedly threatened to place infant plaintiffs into a new foster home with strangers unless Plaintiff complied with their demand that she sign yet another safety plan that would keep the infant plaintiffs out of Plaintiff's custody and with the batterer's family.

112. Finally, after discussions between Plaintiff's counsel and DCFS counsel, defendants Frias and Kimble released infant plaintiffs to Plaintiff shortly after 5:30 p.m. on October 1, 2014.

113. While releasing infant plaintiffs to Plaintiff, Defendant Frias threatened to file child neglect charges against Plaintiff and to put infant plaintiffs in foster care.

114.  Defendant Frias followed Plaintiff to her home with the infant plaintiffs and did a brief safety check of the home. At the home, Defendant Frias repeatedly threatened to commence court proceedings to remove  infant plaintiffs from Plaintiff.

115.  Infant plaintiffs have resided with Plaintiff since October 1, 2014.

116.  At 5:20 p.m. on October 7,  Defendant Frias called Plaintiff again and began to scream at her, demanding that Plaintiff submit to a drug test and demanding that Plaintiff admit her into her home immediately. Plaintiff calmly attempted to reason with Frias and offered to meet Defendant Frias the next day at the DCFS office. Plaintiff ended the call with an offer to call Defendant back or have her counsel call her to discuss the next steps. At approximately 6:20 p.m., Defendant Frias left a threatening voice message with Plaintiff demanding an immediate return phone call or else Defendant Frias would be "taking Plaintiff to court"  at an unspecified time, place and for unspecified reasons.

117. The Complaint is being filed as soon as practicable following Defendant Frias's latest demand and threat against Plaintiff. As of the date and time of the filing of this Complaint,  Defendant Frias's harassment and intimidation of Plaintiff in the exercise of her fundamental liberty interests in care and custody of the minor plaintiff has continued unabated.

118.  Defendants Holliman, Sloan, Saethre, Jacob and Frias's actions against Plaintiff and described herein have operated to favor the batterer as compared to Plaintiff, his victim. As described above, the batterer was allowed to influence the placement of the infant plaintiffs away from Plaintiff and gain substantially greater access to the infant plaintiffs than he would have been able to enjoy absent these defendants' actions herein. The favoring of the batterer

over Plaintiff, his victim, has encouraged the batterer to continue to harass, intimidate and pursue actions against Plaintiff.

119.  Encouraged by the defendants' actions herein, giving him preferential treatment as to the infant plaintiffs, while doing little or nothing to stem his abusive behavior toward Plaintiff, the batterer has twice since October 1 filed so-called emergency motions seeking to undo the Order of Protection entered against him by the Will County Circuit Court. These repeated actions have forced Plaintiff to repeatedly defend herself in the Circuit Court and to incur legal expenses and costs to do so. The first such motion was filed on October 2 and denied on October 3. The second such motion was filed on October 8 and is set for hearing on October 10, after the filing of this Complaint.

120.  The defendants' conduct in favoring the batterer and disfavoring the Plaintiff, and their failure to take the batterer's violence against Plaintiff seriously, runs directly contrary to sound public policy and professional casework standards and practices regarding the proper treatment of domestic violence perpetrators and victims.

121.  As of the date of the filing of this Complaint, defendants have not provided Plaintiff with written notice of any "indicated" findings of child neglect against her, from which she could appeal to a neutral magistrate.

122.  As of the date of the filing of this Complaint, Plaintiff has received no written notice explaining the nature of the September 25, 2014 Hotline call to her so that she and her counsel can fairly respond to those allegations.

123.  During the entire period starting on August 12, and ending with the return of the infant plaintiffs to Plaintiff's care on October 1, 2014, no legal process was initiated by DCFS or its assigns to secure any court order to command the legal removal of the infant plaintiffs

23

from Plaintiff, to restrict Plaintiff's contact with infant plaintiffs, or to require Plaintiff to obtain any services or comply with any demands upon her as a condition of regaining or maintaining custody of the infant plaintiffs.

**B.   THE   ILLINOIS   LEGAL   FRAMEWORK   GOVERNING   THE INVOLUNTARY REMOVAL OF ABUSED OR NEGLECTED CHILDREN FROM THEIR PARENTS**

124. Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), DCFS receives reports, via calls to the Illinois State Central Register (known as the "Child Abuse Hotline" or "Hotline" or "SCR") from persons who have "reasonable cause to believe a child may be an abused child or a neglected child." 325 ILCS 5/4. DCFS must promptly investigate the reports, *id.* at 5/7, working jointly with law enforcement authorities if the allegations give rise to a potential criminal complaint. *Id.* at 5/7.3.

125. Under Illinois law, only police officers, doctors, and DCFS investigative employees have authority to remove children involuntarily from their parents. 325 ILCS 5/5. This authority under Illinois law exists only if "there is not time to apply for a court order," and leaving the child in the custody of his or her parent(s) would "endanger[] the child's health or safety." *Id.*

126. As a constitutional matter, to remove children from their parents involuntarily, a state actor must have probable cause to believe that the children have been abused or neglected by the parents. Absent exigent circumstances or a court order, a DCFS investigator may not take children from their parents without the voluntary consent of the parents. *Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2014).

127. DCFS policies require that a DCFS supervisor and/or, on information and belief, an area administrator, approve any removal of children from parents pursuant to a Hotline call investigation.

128. Children whom DCFS has removed involuntarily from parents must be brought before judicial officers within 48 hours, exclusive of holidays and weekends. 705 ILCS 405/2-9. If a judicial officer does not approve the continued detention of a child, or if the child is not brought before a judicial officer within the 48-hour period, DCFS must release the child. *Id.* DCFS is not allowed to wait for the 48-hour period to elapse if, during the 48 hour period, DCFS staff learn that there is not probable cause to continue to detain the child. *Hernandez, supra.*

129. Nothing in Illinois law permits a DCFS employee to coerce a parent's signature on an out-of-home quasi-foster care placement or so-called safety plan requiring a parent to assent to the removal of her children from her care.

130. In order to continue detaining children away from their parents, DCFS must file a petition against the parents and appear before a judge. At a temporary custody hearing which must be held within 48 hours of the detention of children away from their parents without parental consent, the juvenile court must find there is "immediate and urgent necessity" to keep the children from the parents. 705 ILCS 405/2-10.

131. Illinois law does not authorize DCFS employees to issue directives to families concerning their family lives. If DCFS determines that parents should live under restrictions (such as having "no unsupervised contact" with their children), DCFS must file a petition with a juvenile court, requesting the court to order such restrictions.

25

132. To make appropriate orders including restrictions on contact between parents and their children pursuant to the Illinois Juvenile Court Act, the juvenile court first must find there is probable cause to believe that the children are abused or neglected, 705 ILCS 405/2-10 (requiring dismissal of petitions as to which there is no probable cause). Then, under appropriate circumstances and with an evidentiary showing to support such relief, the juvenile court is authorized to enter orders of protection requiring families to abide by restrictive conditions on their family life. 705 ILCS 405/ 2-25.

**C. THE ILLINOIS LEGAL FRAMEWORK FOR COMPLETING INVESTIGATIONS AND MAKING INDICATED FINDINGS, INCLUDING FOR ALLEGATION 60 ("ENVIRONMENT INJURIOUS")**

133. Hotline calls may be screened out if they do not fit within the Illinois "allegation system." Upon receipt of Hotline calls, the State Central Register codes calls according to allegations set forth in definitions promulgated as rules under the Administrative Procedures Act. As relevant here, Allegation 60 is the neglect allegation that addresses claims of child neglect due to subjecting a child to an "environment injurious" to the child's health, safety and well-being.

134. DCFS is required to complete investigations of Hotline calls that are accepted for investigation within 60 days, whether or not DCFS seeks any court orders regarding the children. DCFS investigators must determine if the allegations under investigation are "indicated" or "unfounded". 325 ILCS 5/7.12. In making the determination, DCFS investigators must consider all available evidence, including exculpatory evidence. It must also apply regulations adopted pursuant to ANCRA to the assessment of whether there is sufficient "credible" evidence to indicate an allegation.

135. DCFS must report its determination (of "indicated" or "unfounded") to the Illinois State Register forthwith. 325 ILCS 7/7, 7/12.

136. Statutory amendments to ANCRA in 2012 provide that a home environment constitutes child neglect if it is so injurious to a child that it: "(i) creates a likelihood of harm to the child's health, physical well-being, or welfare and (ii) the likely harm to the child is the result of blatant disregard of parent or caretaker responsibilities." 325 ILCS 5/3.

137. Contrary to ANCRA, DCFS has at various times since 2001 maintained administrative rules and procedures that have defined "environment injurious" very broadly to include within its scope both victims and perpetrators of domestic violence, so that it treated domestic violence victims as neglectful parents, even without statutory authority to investigate or indicate persons for child neglect on this basis.

138. In 2013, the Illinois Supreme Court declared "void" the DCFS rule setting forth Allegation 60's definition of "environment injurious" because it had been promulgated without legal authority. *See Julie Q. v. Dep't of Child and Family Serv.*, 2013 IL 113783 (Ill. S. Ct. March 21, 2013).

139. As a result of the Illinois Supreme Court's ruling, DCFS issued over 19,000 letters reporting that DCFS had removed Allegation 60 indicated findings from the SCR because these findings creating an "environment injurious" as to their children were legally void.

140. Despite that ruling and the action of removing thousands of wrongly indicated persons' names from the SCR, DCFS continued to mark investigations "indicated" using the void procedure developed in accordance with the void rule. On September 3, 2013, a class action lawsuit was filed seeking to compel DCFS to amend its void rule for once and for all. *See Ashley M. et al v. Calica*, 13 CH 20278 (Cir. Ct. Cook County).

141. On June 11, 2014, DCFS formally adopted a rule setting forth a legally authorized definition of "environment injurious." The definition in the Allegation 60 Rule in effect at the time of the Hotline call against Plaintiff provides that "The adult victim of domestic violence, who is the non-offending parent or caregiver, is presumed to not be neglectful or to have created an environment injurious to the child so long as he or she has exercised precautionary measures to prevent or mitigate the real, significant and imminent risk of moderate to severe harm to the child." 89 Ill. Admin. Code § 300 App'x B #60.

142. Despite having a formal rule in the Illinois Administrate Code that specifies a parent who is presumed to be not neglectful, at all times relevant to this complaint, up to and including the date on which this complaint is filed, DCFS had not issued written policies, procedures, or directives to its investigators as to the requirements of Allegation 60 as amended in the June 11, 2014 rule. Instead, DCFS continues to maintain a written procedure in its Rule and Procedures Manual that contains language identical to the language of the rule that the Illinois Supreme Court held to be void.

143. On information and belief, as of the dates on which the Hotline was called to initiate an investigation of child neglect against Plaintiff, DCFS has not trained its investigators, supervisors and area administrators, or its assigns, including Defendant CHAID and CHAID employees, that Allegation 60 in the form set forth in the unamended DCFS procedures should no longer be used to investigate, indicate, or take action against persons subject to Hotline call.

144. On information and belief, at the time of the incidents complained of herein, all defendants named herein, except for Defendant Gregg, were not actually aware, and had not been instructed, that a non-offending adult victim of domestic violence is "presumed to not be neglectful or to have created an environment injurious to the child so long as he or she has

28

exercised precautionary measures to prevent or mitigate the real, significant and imminent risk of moderate to severe harm to the child."

## V. CLAIMS FOR RELIEF.

### A. COUNT I: PLAINTIFFS A.B. AND R.B.'S 42 U.S.C. § 1983 CLAIMS FOR UNREASONABLE SEIZURE UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION

145. The Plaintiffs in Count I are A.B. and R. B .

146. As paragraphs 147-290, A.B. and R. B. incorporate paragraphs 1-144 as if fully set forth herein.

291. The Count I Defendants are Defendants Holliman, Yanes, and Carlisle, sued in their individual capacities. Defendant Carlisle is sued based on information and belief that she actually participated in the decision to seize and/or detain infant plaintiffs from plaintiff as required by DCFS policy and practice for a person in her position as Area Administrator.

292. The Count I Defendants, acting individually and in concert with one another, violated the rights of A.B. and R.B. under the Fourth Amendment to the United States Constitution (as applicable to the States under the Fourteenth Amendment to the United States Constitution), by directing or engaging in their seizure from the care and custody of their mother Plaintiff: (1) without definite and articulable evidence giving rise to a reasonable suspicion that she had been abused or neglected by her mother or without probable cause; and (2) without exigent circumstances being present to justify such action absent a court order.

293. The actions and conduct of the Count I Defendants caused injury to A.B. and R.B.

294. As relief for the violation of plaintiffs A.B.'s and R.B.'s rights as set forth herein, the plaintiffs seek: (a) a declaratory judgment that the Count I Defendants' actions violated their rights under the Fourth Amendment; (b) compensatory damages against the Count I

Defendants in an amount not less than $50,000 for each plaintiff; (c) punitive damages against Defendant Holliman; (d) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and (e) any other relief, including, but not limited to, an award of costs, as this Court deems appropriate.

**B.    COUNT II:  PLAINTIFFS A.B., R.B. AND VERMEULEN'S 42 U.S.C. § 1983 CLAIM FOR VIOLATION OF THE SUBSTANTIVE DUE PROCESS RIGHTS TO FAMILIAL ASSOCIATION**

295.  The Plaintiffs in Count II are  infant plaintiffs A.B., R.B. and Plaintiff Vermeulen.

296.  Plaintiffs incorporate paragraphs 1 through 144 as paragraphs 297 to 440 as if fully set forth herein.

441.  In this count, plaintiffs sue Gregg in her official capacity and Defendant CHAID, a corporation licensed in the State of Illinois, for declaratory relief. Plaintiffs also sue Defendants Holliman, Yanes, Carlisle, Frias, and Kimble, in  their individual capacities, and Sloan, Saethre, Jones, Casing, Jacob, and CHAID for compensatory relief.  Plaintiffs sue Defendants Holliman, Saethre, and Frias in their individual capacities for punitive damages.

442. All defendants are sued for their actions taken under color of state law.

443. The Count II Defendants, acting individually and in concert with one another, violated the constitutional rights of Plaintiff and infant plaintiffs to familial association, familial autonomy, familial integrity, and family privacy by arbitrarily separating Plaintiff from infant plaintiffs, removing infant plaintiffs from Plaintiff, and placing the infant plaintiffs with persons who were virtual strangers to them in a limbo quasi-foster care status that was the actual and legal equivalent to a placement of infant plaintiffs into State protective custody. When seizing and detaining infant plaintiffs from Plaintiff, Count II Defendants did not possess definite and articulable evidence giving rise to a reasonable suspicion that A.B. and

R.B. had been or would be abused or neglected by Plaintiff, and there were no exigent circumstances justifying such action absent a court order.

444. Moreover, by restricting Plaintiff's parental rights to custody, control and contact with infant plaintiffs, and by falsely representing the facts and legal basis upon which these conditions were imposed, the Count II Defendants, acting individually and in concert with one another, violated Plaintiffs A.B., R.B. and Vermeulen's substantive due process rights to familial association, familial autonomy, familial integrity, and family privacy.

445. In addition to their liability for the actions set forth in paragraphs 297 to 440 above, the individually named Count II Defendants Holliman, Saethre, and Frias, acting individually and/or in concert with one another, violated Plaintiff's due process rights by repeatedly threatening Plaintiff in the exercise of her custodial rights even though there were no grounds to believe that infant plaintiffs were in imminent danger of abuse or neglect from Plaintiff.

446. Defendants Holliman, Yanes, Carlisle (on information and belief), CHAID, Sloan, Saethre, Jones, Jacob, Casing (on information and belief), Frias and Kimble have each acted without legal authority and arbitrarily and in a manner that shocks the conscience, including but not limited to operating at all times pursuant to an allegation of child neglect, and using a written procedure against Plaintiff which has been declared as void *ab initio* by the Illinois Supreme Court, as purported justification for their actions impairing all plaintiffs' constitutional rights as a family.

447. From August 12, 2014 to the present time, Defendant Gregg maintained policies and practices that permitted or authorized the individual defendants' and CHAID's actions or failed to adopt reasonable policies or practices that reasonably would have prevented the violation of plaintiffs' rights.

448.  The specific dates on which each Defendant sued in their individual capacities had direct responsibility for violating the rights of the plaintiffs in the manner set forth in paragraphs as incorporated herein 1-144, and in paragraphs 441-446 above, are as follows:

(a) Defendants Holliman and Yanes violated these rights commencing with the threats Holliman issued on August 12, 2014 which defendant Yanes approved and ratified beginning on the same date and continuing through the dates on which they concluded the investigation of Plaintiff for alleged "environment injurious."  At all times during this period, Defendants Holliman and Yanes had the legal duty, responsibility and authority to end the deprivation of substantive and procedural due process to which their actions commencing on August 12 had caused, but they intentionally, maliciously, recklessly and/or with deliberate indifference did not do so;

(b) Defendant Carlisle is sued on information and belief that she had personal responsibility to approve the continuing deprivation of plaintiffs' substantive and procedural due process rights through the initial removal the children from Plaintiff's care and the continued withholding of the plaintiff children from her care;

(c) Defendants Sloan, Saethre, Casing, Jones, Jacob and CHAID assumed responsibility for continuing the State's unlawful removal of A.B. and R.B. from their mother's care and custody, unreasonably limiting the association of the plaintiffs with each other, and unreasonably conditioning the return of the child upon demands that they had no legal authority to issue. Defendants Sloan and Saethre were directly responsible for these actions from approximately August 28 through the date on which this complaint is filed. At all times from the date on which they assumed responsibility, these defendants had the legal duty, responsibility and authority to end the deprivation of substantive and procedural due process

that their actions had caused to continue, but they intentionally, maliciously, recklessly and/or with deliberate indifference did not do so;

(d) CHAID acted through its employees to continue the unlawful removal of the infant plaintiffs from Plaintiff from the date on which it was assigned case management responsibilities by DCFS until the infant plaintiffs returned to Plaintiff's custody on October 1, 2014;

(e) CHAID obstructed the Plaintiff's efforts to reunite with her children when, after declaring that the placement with the quasi-foster parents was being terminated sometime between September 26 and September 29, the CHAID employee defendants herein refused to assist Plaintiff to locate the infant plaintiffs or to restore them to Plaintiffs' custody;

(f) Defendants Frias and Kimble continued the detention of the infant plaintiffs on October 1 2014, intentionally refused to release the infant plaintiffs to Plaintiff despite having the authority to do so, and obstructed Plaintiff's enforcement of a lawful Order of Protection on October 1, 2014;

(g) Defendant Frias baselessly threatened Plaintiff as to the exercise of her custodial rights before the infant plaintiffs were returned to her care and afterwards on October 1, 2014. Defendant Frias, willfully and in deliberate disregard to Plaintiff's fundamental rights, obstructed her from obtaining information about the infant plaintiffs whereabouts on the day of October 1. Even after Defendant Frias had direct contact herself with the infant plaintiffs, she willfully and deliberately withheld the infant plaintiffs from Plaintiff, refusing to allow any contact until after 5:30 p.m. on October 1;  and

(h) Defendants Gregg, Carlisle, CHAID and Jacob each had legal responsibility but failed to exercise the responsibility to insure that the void Allegation 60 procedure did not

continue to be used to impair the constitutional rights of plaintiffs. These defendants unreasonably failed to issue directives, insure training of staff under their supervision, or take reasonable steps to require that they and individual defendants named herein cease to use a legally void Allegation against the Plaintiffs.

449. The actions and conduct of the Count II Defendants caused injury to each of the plaintiffs.

450. As relief, plaintiffs demand: (a) a declaratory judgment against Defendants Gregg and CHAID against the policies and practices of DCFS and CHAID whose application to plaintiffs deprived them of substantive due process; (b) a declaratory judgment that each of the defendants Holliman, Yanes, Frias and Kimble in their individual capacities and Sloan, Saethre, Jones, Casing, Jacob, and CHAID violated plaintiffs' rights to procedural due process; (c) compensatory damages against the Count II Defendants in an amount not less than $50,000 for each Plaintiff; (d) punitive damages against Defendants Holliman, Saethre and Frias; and (e) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief, including, but not limited to, an award of costs, as this Court deems appropriate.

451. Each defendant sued in her individual capacity acted intentionally, recklessly and/or with deliberate indifference and/or in accordance with policies and practices of which they had been directed to follow, without regard to the legality of such policies and practices to the consequences of their actions as set forth above.

C. **COUNT III: PLAINTIFFS A.B., R.B. AND VERMEULEN'S 42 U.S.C. § 1983 CLAIM FOR VIOLATION OF PLAINTIFFS' RIGHTS TO PROCEDURAL DUE PROCESS**

452. Plaintiffs in Count III are infant plaintiffs A.B., R.B. and Plaintiff Vermeulen.

453. Plaintiffs A.B., R.B., and Vermeulen incorporate paragraphs 1-144 as paragraphs 454-597 as if fully set forth herein.

598. In this Count III, plaintiffs sue Defendant Director Gregg in her official capacity and Defendant CHAID, for declaratory relief against the policies and practices of the DCFS defendants whose application to plaintiffs deprived them of procedural due process, and they seek a declaratory judgment that each of the Defendants Holliman, Yanes, Frias and Kimble in their individual capacities and Sloan, Saethre, Jones, Casing, Jacob, and CHAID violated plaintiffs' rights to procedural due process. Plaintiffs sue Defendants Holliman, Yanes, Frias and Kimble in their individual capacities for compensatory relief and also sue Sloan, Saethre, Jones, Casing, Jacob, and CHAID, for compensatory relief.

599. All defendants are sued for their actions taken under color of state law.

600. Even though there was ample time to secure a court order prior to seizing the infant plaintiffs from Plaintiff, defendants continued to detain the infants, placing them in a home away from their mother and restricting the association of the plaintiffs with each other, without any court order authorizing their actions, though each had a responsibility to secure such an order in the event they believed they had grounds to deprive plaintiffs of their fundamental rights to familial association.

601. By acting without any process that would authorize them to seize, detain, separate, place the infant plaintiffs away from the infant plaintiffs' parents, and restrict plaintiffs' rights to live together as a family and to have contact with each other, either prior to taking such action or in a timely manner after taking such action, defendants deprived each plaintiff of their fundamental liberty interests in familial association without affording plaintiffs procedural due process.

602. The actions and conduct of the Count III Defendants caused injury to each infant plaintiff and Plaintiff.

603. As relief, plaintiffs seek (a) a declaratory judgment against each of the Count III Defendants' actions which violated their rights to procedural due process; (b) compensatory damages in an amount of at least $50,000 for each Plaintiff against the Count III Defendants; and (c) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief including, but not limited to, an award of costs as the Court deems appropriate.

604. Given that the Count III Defendants acted intentionally, recklessly and/or with deliberate indifference to the consequences of their actions as set forth above, plaintiffs seek an award of punitive damages against the Count III Defendants Holliman, Saethre and Frias.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs A.B., R.B, and Vermeulen respectfully request that this Court enter the following judgments and awards on behalf of plaintiffs:

(a)  A declaratory judgment in their favor on all counts;

(b)  Compensatory damages, exclusive of costs and interest, against each of the individual defendants who have been named in their individual capacities herein and against CHAID and Defendants Sloan, Saethre, Jones, Casing, and Jacob to which Plaintiffs are found to be entitled as set forth above;

(c)  Punitive damages against Defendants Holliman, Saethre and Frias, exclusive of costs and interest, to which Plaintiffs are found to be entitled;

(d)  An award of interest, costs, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and 29 U.S.C. § 794a; and

(e)  Such other relief as this Court deems just and equitable.

Dated:  October 9, 2014          Respectfully submitted,


By:  /s/Diane L. Redleaf

Diane L. Redleaf
Sara E. Gilloon
Family Defense Center
70 East Lake Street, Suite 1100
Chicago, Illinois 60601
Tel.:  (312) 251-9800
dianeredleaf@gmail.com
sara@familydefensecenter.net

Carolyn A. Kubitschek
Appearing *Pro Hac Vice*
(Licensed to Practice in the State of New
York since 1974)
Lansner & Kubitschek
325 Broadway, Suite 203
N.Y. NY. 10007
Tel: (212) 349-0900
ckubitschek@lanskub.com

*Attorneys for Plaintiffs*